AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>LEONARDO ZAMORA | DOCKET NO.<br>19MJ 02251 |
| | MAGISTRATE'S CASE NO.<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>MAY 29 2019<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY |

Complaint for violation of Title 21, United States Code, Section 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE GAIL STANDISH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>May 14, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 841(a)(1)]

On or about May 14, 2019, in Los Angeles County, within the Central District of California, defendant LEONARDO ZAMORA knowingly possessed with intent to distribute a controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**GERARDO RAMIREZ**<br>OFFICIAL TITLE<br>Postal Inspector -- United States Postal Inspection Service |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>May 29, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Sylvia R. Ewald x10717      REC: Detention

## AFFIDAVIT

I, Gerardo Ramirez, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Leonardo Daniel Zamora ("ZAMORA") for a violation of Title 21, United States Code, Section 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the United States Postal Inspection Service ("USPIS"), in Los Angeles, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A:

    a.    A black Samsung cell phone bearing international mobile equipment identity ("IMEI") number 359988090127666 ("SUBJECT DEVICE 1"); and

    b.    An HP Stream laptop bearing serial number 5CD8504K1L ("SUBJECT DEVICE 2").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft), and Title 21, United States Code, Sections 841(a)(1)

(possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since February 2013. I am currently assigned to the Los Angeles Division Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of other persons' information for financial gain. I completed a twelve-week basic training course in Potomac, Maryland. That course included training in the

investigation of identity theft via the United States Mail.
From my discussions with other Postal Inspectors I have learned
about mail theft investigations and common mail theft and
identity theft practices.

### III. SUMMARY OF PROBABLE CAUSE

6.    On May 14, 2019, Huntington Park Police Department
("HPPD") officers were dispatched to 6364 Cedar Street,
Apartment I, Huntington Park, California, 90255, in response to
a phone call from ZAMORA's mother reporting that ZAMORA and his
friends were trespassing in her home.  Upon arresting ZAMORA on
an outstanding warrant, they patted him down and found in his
pocket a Samsung cell phone (SUBJECT DEVICE 1).  The officers
searched a backpack ZAMORA was carrying, finding a scale and
approximately 49.3 gross grams of a white crystallized substance
that field-tested positive for methamphetamine.  The officers
also found in the backpack mail, identification cards, and
credit cards that were not in ZAMORA's name, as well as a card
reader/writer and an HP laptop (SUBJECT DEVICE 2).  In a
Mirandized interview, ZAMORA admitted that the backpack and all
of its contents belonged to him.

### IV. STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.    Outstanding Warrant and Arrest of ZAMORA**

8.    From my review of incident report 19-02852 written by
HPPD Officer Raymond Gradillas, I learned the following:

3

a.   On May 14, 2019, HPPD officers were dispatched to 6364 Cedar Street, Apartment I, regarding a trespass investigation.  The reporting party, Imelda Romero, advised that her son, ZAMORA, along with two friends, were inside her apartment.  Ms. Romero said that her son did not live at the apartment, and he was not welcome there.

b.   Prior to their arrival at the residence, the officers requested a records check of Leonardo Zamora.  They discovered he had an outstanding warrant for his arrest under California Penal Code Section 3455(b)(1), for violating a term of post-release community supervision.

c.   Upon the HPPD officers' arrival, Ms. Romero spoke with Detective Palacios.  Ms. Romero stated that ZAMORA and his friends were still inside her apartment and gave the officers permission to enter her apartment.  As the officers approached the front door, ZAMORA and his two friends left the apartment through the front door.  Ms. Romero identified ZAMORA by yelling his name and pointing at him.  ZAMORA was carrying a grey backpack and a small black bag.  The officers detained the ZAMORA and his friends pending investigation.

d.   The officers asked for and ZAMORA provided his name and date of birth.  The name and date of birth he provided -- October 13, 1986 -- matched the date of birth associated with the outstanding warrant for his arrest.  The officers asked ZAMORA if he was aware he had a warrant for his arrest.  He replied, yes, he was aware.  ZAMORA was then placed under arrest for the outstanding warrant.

4

**B.   Search of ZAMORA's Backpack**

e.   Incident to ZAMORA's arrest, HPPD Officers searched the two bags ZAMORA was carrying.  Inside the front pocket of the backpack, Officer Gradillas found a large bundle of a white crystalline substance.  Based on the appearance of the substance and on the officer's training and experience, he believed it to be methamphetamine.  Next to the bundle believed to be methamphetamine, Officer Gradillas also found a working measuring scale, which had a small amount of white crystalline substance on it.  Officer Gradillas later weighed the white crystalline substance, which weighed 49.3 grams, including the packaging.[1]  Officer Gradillas also tested the substance using a narcotics identification kit.  The substance tested positive for methamphetamine.

f.   While conducting an inventory search of the backpack at the Huntington Park Police Station, Officer Gradillas discovered approximately 95 pieces of mail addressed to individuals other than ZAMORA.  Officer Gradillas also found in the backpack washed checks, with ZAMORA's name written on them in mismatching fonts, which appeared to be tampered with; several California identification cards, some of which depicted ZAMORA's photograph with different names; several debit/credit cards with the names of individuals other than ZAMORA; and a reader/writer used to encode account information onto magnetic strips.

---

[1] Based on my training and experience, this is a quantity of methamphetamine consistent with distribution, particularly in light of ZAMORA's possession of the scale.

## C. ZAMORA's Statements

g. During a Mirandized interview by HPPD officers, ZAMORA told Officer Gradillas he was in possession of the methamphetamine for personal use. ZAMORA denied selling methamphetamine.

9. On May 15, 2019, USPIS Inspector Eula Toca and I responded to the HPPD station to interview ZAMORA. Prior to any investigative questioning, I advised ZAMORA of his Miranda rights. ZAMORA acknowledged his understanding of his rights and indicated his desire to waive those rights by signing IS Form 1067, Warning and Waiver of Rights. The interview was recorded.

10. I advised ZAMORA that officers found in his backpack a large quantity of mail and identification cards not in his name. ZAMORA said the mail and profiles were given to him by other individuals and that he sometimes trades the mail and profiles for methamphetamine. ZAMORA said he learned to do fraud by trial and error and that he finds it easy to commit fraud via phone and computer. ZAMORA said he does not know the individuals whose names appear on the mail and profiles. ZAMORA stated that the drugs and everything else in the backpack are his and that he takes full responsibility for the contents of the backpack.

## V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

11. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.    People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.    It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

7

c.   Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.   Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

e.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

f.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.   Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-

conspirators by phone, text, email, and social media, including sending photos.

g.    Individuals engaged in mail and identity theft often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

12.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

13.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

14.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

　　　　b.　　Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

　　　　c.　　The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

　　　　d.　　Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

15.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

16.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VIII.    CONCLUSION

17.  For all of the reasons described above, there is
probable cause to believe that ZAMORA has committed a violation
of Title 21, United States Code, Section 841(a)(1).  There is

12

also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/S/
_____
Gerardo Ramírez,
United States Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me this 29 day of May, 2019.

_____
UNITED STATES MAGISTRATE JUDGE
Gail J. Standish

13